## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILLIAM KENLEY,

     Plaintiff,

        v.

DISTRICT OF COLUMBIA, *et al.*,

     Defendants.

Civil Action No.  14-1232 (JEB)

## MEMORANDUM OPINION

In this lawsuit, Plaintiff William Kenley recounts a particularly unpleasant experience with the Metropolitan Police Department.  On June 20, 2013, he alleges that he witnessed MPD officers assaulting and arresting his friend without any justification, so he began to videotape the interaction on his cellphone.  In response, an officer charged at him, knocked his phone from his hands, and pushed him to the ground.  MPD officers then gathered at the scene and conspired to arrest him in retaliation for his recording and to cover up their wrongful conduct.  In furtherance of this plan, Kenley alleges, they falsely claimed that he had goaded his dog to attack one of the officers.  As a result, he was arrested, detained overnight, and formally charged with assault on a police officer.  An unknown officer also contacted his employer to inform it of his arrest, causing him to be suspended from work until the prosecutor eventually moved to dismiss the charges.

This course of events precipitated this action against the District of Columbia and four MPD officers for violations of Kenley's First, Fourth, and Fifth Amendment rights and for related state-law torts.  Defendants have filed separate Motions to Dismiss, alleging defects in certain of these claims, and Kenley now seeks leave to amend his Complaint.  Defendants oppose on the ground that amendment would be futile.  The Court agrees with respect to some

claims, but not others.  It will, accordingly, grant Plaintiff's Motion to Amend in part, allowing

certain causes of action to proceed against certain Defendants.

**I.      Background**

Taking the facts as alleged in the proposed Amended Complaint, the Court begins with

Kenley's observing Metropolitan Police Department officers' false arrest of his friend, Richard

Jones, on June 20, 2013.  See Am. Compl., ¶¶ 1, 8, 10-11.  One of the officers, Adam Shaatal,

had approached Jones's parked car and, "for no apparent reason," demanded that he produce

identification and step out of his vehicle.  Id., ¶ 9.  When Jones "voiced offense" at the officer's

"hostile and threatening approach and asked why he was being questioned," Shaatal told Officer

Michael Littlejohn that Jones was resisting arrest.  Id., ¶¶ 9-10.  The two proceeded to place

Jones in a chokehold, beat with him a baton, and force him to the ground.  Id., ¶ 10.

Kenley, "standing a safe distance away," started videotaping the incident on his

cellphone.  Id., ¶ 11.  He "repeatedly noted . . . that Jones was not resisting."  Id.  As Shaatal

placed Jones in handcuffs, he looked at Kenley and told Officer Brandon Baldwin to "get him

back."  Id.  Baldwin subsequently "charged" at Kenley, intentionally knocking his cellphone

from his hands and shoving him "violently" to the ground.  Id., ¶ 12.  Kenley dropped his phone

and suffered injuries to his left ankle as a result.  Id.

Around the same time, Kenley's mother opened the front door of his house, and his dog

came running out.  Id., ¶ 13.  The officers drew their guns and pointed them at Kenley and his

dog.  See id.  "[I]n an effort to defuse the situation," Plaintiff took the dog back inside.  Id.

Officers Shaatal, Littlejohn, and Baldwin then met with other officers who had arrived at

the scene.  See id., ¶ 16.  During this meeting, which lasted for an "extended period of time,"

Shaatal, Littlejohn, Baldwin, Sergeant Jonathan Dorrough, and others "agreed to falsely charge

Mr. Kenley with assaulting a police officer" and to "institute criminal proceedings" against him in order to intimidate him and "cover up their wrongful conduct." Id., ¶¶ 16-18.  In aid of this effort, Officer Shaatal claimed that Kenley had assaulted him by instructing his dog to "get him, sic him." Id., ¶ 20.  Kenley was arrested, and Baldwin, who "knew or should have known" that Shaatal's claim was false, wrote up an arrest report based on his accusation. Id.  Shaatal told Kenley: "Next time, mind your business . . . see you in court . . . animal control is coming for your dog . . . there goes your job." Id., ¶ 14 (internal quotation marks omitted).

Afterwards, Dorrough secured the area and canvassed it for witnesses. See id., ¶ 21.  At least two were interviewed, and one of whom gave a statement that when the dog ran outside, Kenley did not encourage it to attack, but instead said, "Mom, put her back in the house." Id. (internal quotation marks omitted).  That evening or the next morning, Dorrough told Baldwin about the exculpatory statement.  Although Baldwin, the "papering officer," and Dorrough, the supervising officer, were allegedly required to turn over all witness statements to the U.S. Attorney during the "papering" process – i.e., the prosecution's initial screening of the case for formal charging – they did not disclose this statement. See id., ¶¶ 22-23.  Nor did Shaatal. See id., ¶ 22.  Baldwin and Littlejohn also did not divulge to the prosecution that they were present when the dog ran out and that they did not hear Kenley say "get him, sic him." See id., ¶ 19.

As a result of the officers' actions, Kenley was detained overnight, presented in court, and charged with felony assault on an officer. See id., ¶ 20.  Sometime after the arrest, an unknown officer also informed Kenley's employer of the charges, and he was suspended from work without pay while the case was pending. See id., ¶ 15.  Over a month after the incident, the witness statement and "exculpatory evidence" were finally turned over to the prosecutor. See id., ¶¶ 25-26.  After receiving this information and conducting an investigation, the prosecutor

moved to dismiss the charges against Kenley, and his case was dismissed on September 18, 2013.  See id., ¶ 26.

Plaintiff suffered a number of injuries as a result of this incident, including "lost wages, medical expenses[,] . . . emotional distress, and . . . damage to his professional reputation."  Id., ¶ 40.  He thus filed an initial Complaint in D.C. Superior Court on June 20, 2014, against Officers Shaatal, Littlejohn, and Baldwin, as well as Sergeant Dorrough and the District of Columbia.  He alleged a variety of claims under 42 U.S.C. § 1983 and the U.S. Constitution, along with several state-law tort claims.  The District removed the case to federal court and thereafter filed a Partial Motion to Dismiss.  See District Mot. to Dismiss, ECF No. 4.  The individual Defendants followed suit, filing their own separate Partial Motions to Dismiss.  See ECF Nos. 7, 8, 12, 14.  Plaintiff now moves to file an Amended Complaint.

## II.    Legal Standards

A plaintiff may amend his complaint once as a matter of course within 21 days of serving it or within 21 days of being served a responsive pleading.  See Fed. R. Civ. P. 15(a)(1).  Otherwise, the plaintiff must seek consent from the defendant or leave from the Court.  See Fed. R. Civ. P. 15(a)(2).  The latter "should [be] freely give[n] . . . when justice so requires."  Id.  In deciding whether to deny leave to file an amended complaint, courts may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  Foman v. Davis, 371 U.S. 178, 182 (1962).  But in this Circuit, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996).

In the present case, Defendants do not argue undue prejudice, delay, or bad faith; instead, they contend only that the Court should not grant leave because amending the Complaint would be futile. Courts need not grant leave to amend if the proposed amendments would still render a complaint deficient. See In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010). That is to say, "a district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss." Id.; see also James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss.").

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed if it fails "to state a claim upon which relief can be granted." In evaluating a motion to dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The notice-pleading rules are "not meant to impose a great burden on a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and he must, therefore, be given every favorable inference that may be drawn from the allegations of fact. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

At the same time, although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). A plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." Id.  The Court need not accept as true "a legal conclusion couched as a factual

allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. Fed.

Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265,

286 (1986) (internal quotation marks omitted)).  And while a plaintiff may survive a 12(b)(6)

motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 555 (citing

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be

enough to raise a right to relief above the speculative level."  Id.

**III.     Analysis**

Plaintiff's proposed Amended Complaint includes federal claims, brought pursuant to 42

U.S.C. § 1983, for violations of his First, Fourth, and Fifth Amendment rights.  It also asserts

state-law tort claims for false arrest, false imprisonment, malicious prosecution, assault and

battery, conspiracy, negligence, and defamation.  In determining whether granting leave to

amend would be futile, the Court has looked primarily at the Motion to Amend the Complaint

and Defendants' arguments in opposition thereto.  The Court has also considered whether any

other arguments from Defendants' earlier Motions to Dismiss would warrant dismissal.  It will

now address the sufficiency of each of Plaintiff's claims in order of count.

A.  Count I: First Amendment Violations

This claim is brought against all four officers and the District of Columbia.  Baldwin,

who is accused of having knocked Plaintiff's cellphone from his hands, concedes that the

Amended Complaint adequately states a First Amendment claim against him.  Dorrough's

Opposition does not address the issue at all, effectively conceding it.  The Court thus analyzes

whether the Amended Complaint is sufficient with regard only to the other two officers and the

District of Columbia.

1. *Individual Officers*

Kenley's First Amendment cause of action against Shaatal and Littlejohn is based on the theory that the officers participated in a conspiracy to deprive him of his free-speech rights. The officers assert that the claim is flawed on two grounds. They argue, first, that the Amended Complaint falls short of adequately alleging the existence of a conspiracy. They then insist that even if it does, the alleged conspiracy took place <u>after</u> the action that forms the basis of Kenley's First Amendment claim – *i.e.*, Officer Baldwin's knocking the phone away – and thus it could not have been formed to deprive him of his First Amendment rights. While not raised specifically in relation to this count, Defendants also argue elsewhere that the intracorporate-conspiracy doctrine bars any finding of a conspiracy in this case. The Court will address these issues in turn.

a. Conspiracy

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." <u>Austin v. District of Columbia</u>, No. 05-2219, 2007 WL 1404444, at *11 (D.D.C. May 11, 2007) (quoting <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 72 (2d Cir. 1999)) (internal quotation marks omitted). A complaint must set forth facts making the existence of a conspiracy plausible; conclusory statements are not enough. Courts have thus dismissed conspiracy claims where, for example, plaintiffs simply alleged that defendants had "agreed" or "conspired" to violate their rights but did not provide a "description of the persons involved in the agreement, the nature of the agreement, what particular acts were taken to form the conspiracy, or what overt acts were taken in furtherance of the conspiracy." <u>Bush v. Butler</u>, 521 F. Supp. 2d 63, 68-69 (D.D.C.

2007); see also, e.g., Mattiaccio v. DHA Group, Inc., 20 F. Supp. 3d 220, 230 (D.D.C. 2014)

(plaintiff failed to plead conspiracy where she only alleged that defendants "entered into an

agreement to commit an illegal act of defamation against [p]laintiff" and that other defendants

"authorized, instigated, condoned and/or participated in the conspiracy to commit the

defamation"); Acosta Orellana v. CropLife Intern., 711 F. Supp. 2d 81, 113 (D.D.C. 2010)

(dismissal of conspiracy claim warranted because plaintiff alleged only that defendants "acted in

concert" and did not, for example, "provide any indication of when or how such an agreement

was brokered").

Here, by contrast, Kenley has specifically named several of the persons involved in the

conspiracy, described the scope of the purported agreement, stated when it was formed, and

identified acts taken in furtherance of it.  More specifically, according to the Amended

Complaint, Officers Baldwin, Shaatal, and Littlejohn met with Sergeant Dorrough and others

who had arrived at the scene "for and [sic] extended period of time."  Am. Compl., ¶ 16.  During

the meeting, they "agreed to falsely charge Mr. Kenley with assaulting a police officer" and "to

unlawfully institute criminal proceedings against . . . [him]."  Id., ¶¶ 17-18.  Their motive was

"to intimidate Mr. Kenley and cover up their wrongful conduct with respect to both Jones and

Kenley."  Id., ¶ 18.  Among other things, to advance the conspiracy, Baldwin wrote an arrest

report that included a fabricated claim that Plaintiff had instructed his dog to attack Shaatal.  See

id., ¶ 20.  These allegations sufficiently plead the existence of a conspiracy.

### b.  Relevant Conduct

Kenley has also adequately alleged that the officers conspired to deprive him of his First

Amendment rights.  Defendants do not challenge the theory that videotaping police officers and

making statements about their conduct is protected by the First Amendment, so the Court

assumes for purposes of this Motion that it is.  The officers seem to believe, however, that the only conduct implicating Kenley's First Amendment rights was Baldwin's action striking the cellphone from his hands, and that, therefore, the other officers cannot be held liable for any First Amendment violation.  But Kenley's allegations are broader than this.  He also asserts that the officers conspired to falsely arrest him and charge him with assault on an officer <u>because</u> he had recorded them and commented that Jones was not resisting arrest – *i.e.*, in retaliation for exercising his First Amendment rights.  <u>See</u> Am. Compl., ¶ 11-18; Reply to Officers' Opp., ECF No. 38, at 8.

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."  <u>Hartman v. Moore</u>, 547 U.S. 250, 256 (2006) (quoting <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 n.10 (1998)) (alteration in original).  A plaintiff may have a viable claim that his First Amendment rights were violated if he alleges that he was arrested or that criminal charges were pursued against him, in the absence of probable cause, because of a government official's retaliatory animus against his speech.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Patterson v. United States</u>, 999 F. Supp. 2d 300, 308 (D.D.C. 2013) ("[I]t is well established that where . . . there is an allegation of retaliatory arrest in the absence of probable cause, the plaintiff has a viable First Amendment claim.") (emphasis omitted); <u>Westfahl v. District of Columbia</u>, No. 11-2210, 2014 WL 6999078, at *4 (D.D.C. Dec. 12, 2014) (denying summary judgment for defendants on plaintiff's First Amendment retaliation claim because jury could find absence of probable cause and that plaintiff's "participation in [a] protest may have motivated his arrest").

Taking Plaintiff's allegations as true, as the Court must at this stage, Kenley has

sufficiently stated a First Amendment claim.

c.   Intracorporate-Conspiracy Doctrine

Although not specifically asserted in relation to Plaintiff's First Amendment claims,

Defendants also rely on the intracorporate-conspiracy doctrine to maintain that they could not

have engaged in a conspiracy.  "[T]his doctrine states that a corporation cannot conspire with its

employees, and its employees, when acting within the scope of their employment, cannot

conspire among themselves."  Tabb v. District of Columbia, 477 F. Supp. 2d 185, 190 (D.D.C.

2007) (internal quotation marks and citation omitted).  It originated in the antitrust context,

where the Supreme Court held that a parent corporation and its wholly owned subsidiary could

not have violated the conspiracy provisions in Section 1 of the Sherman Act because they were

the same legal entity – that is, there were not two distinct legal actors capable of conspiring with

one another.  See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 (1984).

Lower courts have extended the doctrine's application to other contexts over the last three

decades.  They have, for instance, frequently applied it to prohibit claims that entities and their

employees, or their employees by themselves, violated the anti-conspiracy provisions in 42

U.S.C. § 1985.  See Bowie v. Maddox, 642 F.3d 1122, 1130 (D.C. Cir. 2011) (listing cases).

Indeed, numerous district courts in this jurisdiction have applied it to bar Section 1985

conspiracy claims against employees of the same government entity.  See, e.g., Tabb, 477 F.

Supp. 2d at 189-90 (holding two District employees could not have violated § 1985(2) by

conspiring with one another to fire plaintiff because their acts were attributable to single entity);

id. (listing additional cases applying doctrine to bar § 1985 claims).  The D.C. Circuit, however,

"ha[s] yet to pick sides in the circuit split regarding the doctrine's applicability to civil rights cases in general and the first clause of § 1985(2) in particular." Bowie, 642 F.3d at 1130 n.4.

Even if the doctrine is applicable to Section 1983 cases, this Court harbors significant doubts that it would apply under the circumstances alleged here. As a fellow district court in this jurisdiction explained: "The intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory." Kivanc v. Ramsey, 407 F. Supp. 2d 270, 275 (D.D.C. 2006) (internal quotation marks and citation omitted). Courts, including Kivanc, have thus held that the doctrine is inapplicable in cases alleging egregious police misconduct that cannot be fairly characterized as involving routine business decisions. See, e.g., id. at 276 ("The Court is not persuaded that agreements to conceal assault and battery with false police reports – as plaintiff alleges in this case – could conceivably be classified as the products of routine police department decision-making. The Court declines defendants' invitation to adopt a categorical policy that it is legally impossible for one police officer to conspire with another to deprive an individual of his rights under Section 1983."); see also, e.g., Rawlings v. District of Columbia, 820 F. Supp. 2d 92, 105 (D.D.C. 2011) (noting that even if defendant officers had been acting within the scope of their employment when they tried to retrieve a motorbike from an individual, their alleged agreement to commit assault and battery "could not conceivably be classified as the product of routine police department decision-making," and doctrine would not have protected them from liability); Newsome v. James, No. 96-7680, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000) (rejecting doctrine's application because "[t]he decision to frame plaintiff for . . . murder . . . is not the product of routine police department decision-making"). The Court believes that the decision to falsely charge Kenley with assault on an officer in order to retaliate

against him and cover up the officers' own misconduct can hardly be said to fall within the ambit of routine police-department decisionmaking that the doctrine is meant to cover.

Where courts have recognized the doctrine, moreover, they have noted various exceptions to its application. One carve-out potentially relevant here is for situations in which employees have "an independent personal stake in achieving the corporation's illegal objectives." Rawlings, 820 F. Supp. 2d at 105 (internal quotation marks and citations omitted); see also Bowie, 642 F.3d at 1130 (noting that circuits that have recognized the doctrine in civil-rights cases have found exceptions, including "where the corporate agents' actions were either unauthorized or motivated by 'an independent personal stake in achieving the corporation's illegal objective'") (quoting Buschi v. Kirven, 775 F.2d 1240, 1252 (4th Cir. 1985). "This exception, like the requirement that employees be acting within the scope of their duties, limits the scope of the doctrine to those circumstances where an employee's act is fairly attributable to the employer . . . ." Rawlings, 820 F. Supp. 2d at 105. Courts have, accordingly, rejected the doctrine's applicability where an entity's employees are pursuing their own personal interests, rather than the interests of the corporate entity. See, e.g., Petrishe v. Tenison, No. 10-7950, 2013 WL 5645689, at *6 (N.D. Ill. Oct. 15, 2013) (plaintiff had sufficiently alleged that officers were not pursuing any interests of the city "when they erased six seconds of [a] taser video to cover-up their unjustified shooting of [the plaintiff]"). This exception casts further doubt on the relevance of the doctrine to this case.

The above analysis notwithstanding, the briefing on this issue was rather perfunctory. Although Defendants cited a handful of district court cases applying the doctrine to dispose of § 1985 conspiracy claims, see, e.g., District's Opp., ECF No. 18, at 12 (citing Tabb, 477 F. Supp. 2d at 185, 191; Tafler v. District of Columbia, No. 05-1563, 2006 WL 3254491, at *10 (D.D.C.

Nov. 8, 2006); Michelin v. Jenkins, 704 F. Supp. 1, 4 (D.D.C. 1989); Gladden v. Berry, 558 F.

Supp. 676, 680 (D.D.C. 1983)), they did not engage in any meaningful discussion about its

scope.  Nor did they offer a persuasive reason that it should apply here, when its genesis was to

protect corporations and their employees from "conspiracy liability for routine, collaborative

business decisions that are later alleged to be discriminatory," and when it "has been held by

most courts not to shield defendants from conspiracy claims brought under Section 1983 based

on police misconduct."  Kivanc, 407 F. Supp. 2d at 275-76 (emphasis added; internal quotation

marks and citations omitted).  The Court thus declines, at this juncture, to dismiss the

conspiracy-related claims on this basis.  Defendants may raise the issue again on summary

judgment, but the Court expects a more comprehensive argument.  In the meantime, Kenley may

proceed on his First Amendment claims against all four of the individual officers.

> 2.  *District of Columbia*

The viability of a First Amendment cause of action against the District, conversely, yields

a different outcome.  "[U]nder Section 1983, local governments are responsible only for their

own illegal acts[;] . . . [t]hey are not vicariously liable . . . for their employees' actions."

Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (internal quotation marks and citations

omitted).  To state a Section 1983 claim against a municipality, a plaintiff must therefore allege

that it maintained a policy or custom that caused the violation of his or her constitutional rights.

See id. (citing Monell v. Dep't of Social Services of City of New York, 436 U.S. 658 (1978));

see also Warren v. District of Columbia, 353 F.3d 36, 38 (D.C. Cir. 2004).  In this case, Kenley

does not contend that the District or one of its policymakers adopted an explicit policy of

interfering with the rights of citizens to record police interactions.  In fact, the Amended

Complaint acknowledges that in July 2012, the District issued MPD General Order 304-19,

which explicitly states that officers <u>may not</u> impede the public's right to videotape the police

when they are discharging their official duties.  <u>See</u> Am. Compl., ¶¶ 30-32.  Plaintiff bases his

claim, instead, on the District's failure to train and supervise its officers about this policy.  <u>See</u>

<u>id.</u>, ¶ 45.

The Supreme Court has recognized that a municipality's failure to train its officers can

form the basis of a Section 1983 claim against it, but "only where the failure to train amounts to

deliberate indifference to the rights of persons with whom the police come into contact."  <u>City of</u>

<u>Canton v. Harris</u>, 489 U.S. 378, 388 (1989).  As the Court explained, in some circumstances,

"the need for more or different training is so obvious, and the inadequacy so likely to result in

the violation of constitutional rights, that the policymakers of the city can reasonably be said to

have been deliberately indifferent to the need."  <u>Id.</u> at 390.  That is to say, "when city

policymakers are on actual or constructive notice that a particular omission in their training

program causes city employees to violate citizens' constitutional rights, the city may be deemed

deliberately indifferent if the policymakers choose to retain that program."  <u>Connick</u>, 131 S. Ct.

at 1360 (citing <u>Board of County Comm'rs of Bryan County, Okl. v. Brown</u>, 520 U.S. 397, 407

(1997)).  A municipality can likewise be liable for inadequately supervising its employees if it

was deliberately indifferent to an obvious need for greater supervision.  <u>See, e.g.</u>, <u>Colbert v.</u>

<u>District of Columbia</u>, 5 F. Supp. 3d 44, 60 (D.D.C. 2013).

"Deliberate indifference is a stringent standard of fault . . . ."  <u>Connick</u>, 131 S. Ct. at 1360

(quoting <u>Bryan County</u>, 520 U.S. at 410 (internal quotation marks omitted).  "A pattern of

similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate

deliberate indifference for purposes of failure to train."  <u>Id.</u> (quoting <u>Bryan County</u>, 520 U.S. at

409).  So too with failure-to-supervise claims.  <u>See, e.g.</u>, <u>Colbert</u>, 5 F. Supp. 3d at 60.

Kenley has not cleared this bar here.  For one thing, contrary to Plaintiff's view, his allegation that "the District of Columbia was deliberately indifferent to and failed to exercise reasonable care in its supervision and training of [its] officers" does not provide any support for such a claim.  See Reply to District Opp. at 6 (quoting Am. Compl., ¶ 35).  The statement is nothing more than "a legal conclusion couched as a factual allegation," which the Court is not obligated to accept.  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555); see also, e.g., Sheikh v. District of Columbia, No. 14-316, 2015 WL 58830, at *7 (D.D.C. Jan. 5, 2015) (plaintiff failed to state claim against District of Columbia where complaint provided "no more than a conclusory recital of the elements of a claim pursuant to Monell, together with the alleged predicate constitutional violations").

This leaves only two factual allegations relevant to the District's failure to train and supervise its officers regarding citizens' free-speech rights.  The first states that "prior to July 2012[,] the District of Columbia had a policy and practice of police officers seizing cameras from citizens video[-]taping police arrests in public places and threatening or arresting citizens who failed to stop recording and move away or be arrested."  Am. Compl., ¶ 30.  The second asserts that "Officer Shaatal had a prior history of police misconduct" and that there were "prior complaints" against him.  See id., ¶¶ 27, 67.

The first allegation does not move the ball forward.  Even if true, as noted above, the District adopted a policy clearly prohibiting such conduct in July 2012, nearly a year before the incident at issue in this case.  See id., ¶¶ 31-32.  Kenley does not allege that there have been other instances like the one in which he was involved since that policy was issued.  While it is true that "if a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for," Bryan County, 520 U.S. at 407, he

has not alleged facts showing that the District was on notice that its officers required further

training following the implementation of its new policy.

The latter allegation does not support a deliberate-indifference claim either.  Kenley does

not allege that any of Shaatal's past "misconduct" related to the unconstitutional behavior at

issue here.  He thus does not raise a plausible inference that the city was on actual or constructive

notice that, if it failed to take action, Shaatal would violate Kenley's rights in the manner alleged.

See, e.g., Robinson v. District of Columbia, 965 F. Supp. 2d 90, 96 (D.D.C. 2013) ("[T]he failure

to investigate complaints cannot support a deliberate indifference theory unless the conduct was

suggestive of the unconstitutional behavior on hand and put the District on notice of the

possibility of constitutional violations."); Muhammed v. District of Columbia, 881 F. Supp. 2d

115, 123 (D.D.C. 2012) (rejecting claim that District was deliberately indifferent because

complaints sustained against officer were for "'insubordination' and 'rude/unprofessional'

conduct," which were "not suggestive of the asserted unconstitutional behavior plaintiff alleges

about which the District should have reasonably known"); cf. Bryan County, 520 U.S. at 412 (to

establish municipal liability for failure to screen applicant, "[t]he connection between the

background of the particular applicant and the specific constitutional violation alleged must be

strong" because the question is whether applicant's background made the constitutional violation

"a plainly obvious consequence of the hiring decision") (emphasis added).

There are, in sum, no facts alleged indicating that the District was on notice that its

officers' training or supervision was deficient in ways that would lead to violations of the First

Amendment.  See, e.g., Konah v. District of Columbia, 815 F. Supp. 2d 61, 76 (D.D.C. 2011)

(dismissing § 1983 claim against District because, among other things, complaint did not provide

"any specific factual allegations describing any putative inadequacies in the training of

correctional officers"); Robertson v. District of Columbia, No. 09-1188, 2010 WL 3238996, at

*8 (D.D.C. Aug. 16, 2010) (dismissing § 1983 claim against District because "[a]lthough the

plaintiff in this case alleges that the District acted with deliberate indifference in failing to train

its officers, the complaint contains no facts suggesting that the District knew or should have

known of any deficiencies in the training of its officers with respect to potentially suicidal

detainees."). The Court will, consequently, deny Kenley's Motion to Amend Count I with

respect to the District.

     B.  Count II: Fourth Amendment Violations

     This count is likewise brought against all of the individual officers and the District of

Columbia. It asserts several potential Fourth Amendment violations, including the use of

excessive force, arrest without probable cause, and malicious prosecution. See Am. Compl., ¶¶

49, 50. It also seeks to hold the District liable on the ground that it failed to train and supervise

its officers "in the laws of arrest and use of force." See id., ¶ 51. The Court takes up the claims

against the individual officers first and then considers the District's liability.

     1.  *Individual Officers*

     The Court need not dissect all of the asserted Fourth Amendment violations because

Plaintiff's Amended Complaint easily makes out a claim for unlawful arrest against each of the

officers.  "It is well settled that an arrest without probable cause violates the [F]ourth

[A]mendment." Martin v. Malhoyt, 830 F.2d 237, 262 (D.C. Cir. 1987); see also, e.g., Patterson,

999 F. Supp. 2d at 313 ("[I]t is clear beyond cavil that, in order to arrest someone in a manner

that satisfies the Fourth Amendment, a police officer must have a warrant or probable cause to

believe that the person has committed, or is engaged in committing, a crime."). "An arrest is

supported by probable cause if, 'at the moment the arrest was made, . . . the facts and

circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect has committed or is committing a crime." Wesby, 765 F.3d at 19 (quoting Beck v. Ohio, 379 U.S. 89 (1964)).

Accepting the facts as pled, the officers could not have believed that there was probable cause to arrest Kenley for assault on an officer. After all, Plaintiff alleges that he did not prod his dog to attack Shaatal and that the officers knew this. If true, the officers unquestionably lacked probable cause for the arrest and, consequently, violated the Fourth Amendment's proscription against illegal seizures.

Baldwin's assertion in his Motion to Dismiss that he is protected by qualified immunity does not affect the viability of Kenley's Fourth Amendment claim against him. See Baldwin's Mot. to Dismiss, ECF No. 12, at 9-10. Specifically, Baldwin suggested that he could not be held liable for illegally seizing Kenley because he had relied on Shaatal's instruction when he charged at Plaintiff, and it was not clearly established that he could not rely on such directive. This is beside the point. The Amended Complaint makes clear that the Fourth Amendment false-arrest claim is not based on Baldwin's shoving Kenley to the ground, but instead relies on Baldwin's subsequent involvement in a conspiracy to arrest Kenley based on fabricated information. If established, Baldwin would not have had a reasonable basis for relying on Shaatal regarding the legality of the arrest, as he knew that the allegations against Kenley were false. See Wesby, 765 F.3d at 28-29 (rejecting qualified-immunity defense for officers who claimed they relied on supervisor's order because they did not have reasonable basis for believing a crime had been committed). Kenley may, therefore, move forward on Count II against each of the individual officers.

2. *District*

As discussed previously, to hold a municipality liable, a plaintiff must show that a municipal policy or custom was the "moving force" behind the violation of his or her constitutional rights. See Monell, 436 U.S. at 694-95; see also Warren, 353 F.3d at 38. With respect to his Fourth Amendment claim against the District, Kenley's Amended Complaint is even more deficient than it was with respect to his first cause of action. It, again, alleges no actual policy of unlawful arrests, no similar incidents at any time in the past, and no reason to believe Officer Shaatal's past infractions should have put the District on notice that he would violate Kenley's rights in the manner alleged. See, e.g., Robinson, 965 F. Supp. 2d at 96. Plaintiff's Motion to Amend Count II, insofar as it applies to a claim against the District, is futile.

C.  Count III: Fifth Amendment Violations

This claim is brought against Baldwin, Littlejohn, and Dorrough, as well as the District of Columbia. With respect to the officers, Kenley asserts that their "failures to promptly disclose exculpatory evidence" violated his due-process rights. See Am. Compl., ¶ 54. As to the District, he asserts, once more, that it was deliberately indifferent to his rights, this time by its "fail[ure] to sufficiently train and supervise [its] officers in the procedures regarding the handling of exculpatory evidence and investigation of assault on a police officer." Id., ¶ 55. The Court addresses these separately.

1. *Individual Officers*

Kenley seeks to make out a Brady-style claim against the three officers for their failures to disclose exculpatory information to the prosecutor when the case was "papered" or within a short time after. See Pl.'s Opp. to District's Mot. to Dismiss, ECF No. 9, at 6 (citing Brady v.

<u>Maryland</u>, 373 U.S. 83 (1963)).  In essence, he argues that these officers were at least aware of information contradicting Shaatal's claim that Kenley had urged his dog to attack, but they did not convey this to the prosecutor for at least a month.  The Amended Complaint asserts, for instance, "On information and belief officers Littlejohn and Baldwin were present then [*sic*] Mr. Kenley's dog ran up to him and they did not hear him say to the dog 'get him, sic him'. Littlejohn and Baldwin knew they had a duty to promptly disclose evidence that did not support Shaatal's allegations but intentionally or negligently failed to do so."  Am. Compl., ¶ 19.  The officers' main contention in response is that they are shielded by qualified immunity – namely, that if there is a constitutional duty under which police officers must disclose exculpatory information to the prosecution within one month of its discovery, that duty was not clearly established at the time.  <u>See, e.g.</u>, Baldwin's Opp., ECF No. 34, at 5.

In Section 1983 cases, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Following the Supreme Court's decision in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), courts were required to conduct a two-step inquiry to determine whether an official was qualifiedly immune from suit.  <u>Pearson</u>, 555 U.S. at 232.  First, they had to "decide whether the facts that a plaintiff ha[d] alleged or shown ma[d]e out a violation of a constitutional right."  <u>Id.</u> If they did, courts then had to determine "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct."  <u>Id.</u> (citations omitted).  If it was not, the official could not be held liable.  Later, in <u>Pearson</u>, the Court ruled that the <u>Saucier</u> inquiry should not be regarded as mandatory, meaning that courts may decline to answer the first

question and move directly to the second when the alleged conduct did not violate rights that were clearly established.  See id. at 236.  Following that authorization, this Court declines to resolve the first question – *i.e.*, whether police officers violate the Fifth Amendment when they fail to promptly disclose exculpatory evidence to the prosecution – because it finds that even if such a duty exists, it was not clearly established in June 2013.

To evaluate whether a right was clearly established, a court must first "establish[] the appropriate level of generality at which to analyze the right at issue."  Johnson v. District of Columbia, 528 F.3d 969, 975 (D.C. Cir. 2008) (citations omitted).  It must then "look to cases from the Supreme Court and this [circuit], as well as to cases from other courts exhibiting a consensus view," to determine if it was so established.  Id. at 976 (citing Wilson v. Layne, 526 U.S. 603, 617 (1999)).  The relevant question here is whether police officers who are aware of potentially exculpatory information have a duty, under the Due Process Clause, to disclose that information to prosecutors at the time that a case is first screened for formal charges or, at the very least, shortly thereafter.

Kenley invokes Brady in support of his claim that such a right was clearly established.  But Brady addresses the government's duty to provide a criminal defendant with exculpatory material in time for the defense to make use of it at trial.  See, e.g., Brady, 373 U.S. at 87 (explaining that the purpose is to "avoid[] . . . an unfair trial"); United States v. Agurs, 427 U.S. 97, 107 (1976) (discussing Brady's disclosure requirement as protecting "the defendant's right to a fair trial" under the Due Process Clause); United States v. Pollack, 534 F.2d 964, 973 (D.C. Cir. 1976) ("Disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.").  So too do several of the circuit

decisions Plaintiff cites.  See, e.g., Barbee v. Warden, Md. Penitentiary, 331 F.2d 842, 843 (4th

Cir. 1964) (addressing government's "failure to disclose at the trial potentially exculpatory

evidence in the possession of the police"); Moldowan v. City of Warren, 578 F.3d 351 (6th Cir.

2009) (holding police officers can be liable for Brady violations where they failed to disclose

information to prosecution in case where defendants were convicted at trial).

        Yet Kenley's case never went to trial.  Plaintiff, moreover, has not cited any cases in

which the Supreme Court or the D.C. Circuit has addressed police officers' constitutional duty

under the Due Process Clause to disclose exculpatory information to the prosecution long before

trial.  Looking to other circuits, in fact, it appears that there is disagreement about whether the

due-process rights articulated in Brady are implicated at all where plaintiffs were not convicted

in their criminal cases – e.g., if they were acquitted at trial or if the charges were dismissed prior

to trial.  See, e.g., Livers v. Schenck, 700 F.3d 340, 359 (8th Cir. 2012) ("Our sister circuits

disagree over whether pretrial detainees . . . have a right to disclosure of exculpatory evidence.");

see Taylor v. Waters, 81 F.3d 429, 435-36 (4th Cir. 1996) (plaintiff's claim that investigator

"failed to disclose exculpatory evidence" to prosecution in case in which charges were dismissed

"d[id] not allege a deprivation of any right guaranteed under the Due Process Clause of the

Fourteenth Amendment" because pre-trial deprivations are to be analyzed under the Fourth

Amendment); Flores v. Satz, 137 F.3d 1275, 1278-79 (11th Cir. 1998) ("Plaintiff . . . was never

convicted and, therefore, did not suffer the effects of an unfair trial.  As such, the facts of this

case do not implicate the protections of Brady."); see also Michael Avery, Paying for Silence:

The Liability of Police Officers Under Section 1983 for Suppressing Exculpatory Evidence, 13

Temp. Pol. & Civ. Rts. L. Rev. 1, 2 (2003) ("[T]he lower federal courts are in agreement that

when a police officer fails to disclose exculpatory evidence to the prosecutor and a criminal

defendant is <u>convicted</u> at a trial as a result, the convicted defendant may make a claim for damages against the officer under § 1983.  <u>When the case terminates prior to the conclusion of a trial</u>, however, the courts disagree about whether the defendant has a cause of action for a violation of his or her constitutional rights.") (emphasis added).

The Court is, consequently, not persuaded that there was a clearly established <u>due-process</u> right under which police officers who were aware of potentially exculpatory information had to disclose it to the prosecution when the case was first papered or within a short time after. The officers, therefore, are immune from any Fifth Amendment claim based on their non-disclosure.

In his briefs, Kenley also argues that the three officers violated his Fifth Amendment substantive-due-process rights because, alternatively, they were part of an effort to manufacture evidence against him – *i.e.*, to make up the false claim that he had instructed his dog to attack Shaatal.  <u>See, e.g.</u>, Pl.'s Opp. to Baldwin's Mot. to Dismiss, ECF No. 21, at 8.  Although the Amended Complaint contains factual allegations that these Defendants participated in a conspiracy to fabricate evidence, Count III – which addresses his Fifth Amendment claim – appears to limit that cause of action to the three officers' "failures to promptly disclose exculpatory evidence."  Am. Compl., ¶ 54.  This reading is further supported by the fact that the claim is asserted only against Baldwin, Littlejohn, and Dorrough, and omits Officer Shaatal – the Defendant directly responsible for the allegedly false evidence.  Plaintiff's Fifth Amendment claim against the officers, consequently, may not proceed.

2. *District*

Yet again, the Amended Complaint falls short of alleging a § 1983 claim against the District.  To begin, it does not outline any policy or custom of the MPD to withhold exculpatory

evidence.  Nor does it suggest that the District was deliberately indifferent.  While it alleges that

the municipality failed to provide adequate training "regarding the handling of exculpatory

evidence and investigation of assault on a police officer," Am. Compl., ¶ 55, this conclusory

assertion, standing alone, is insufficient.  Since there are no additional allegations to support this

claim – *e.g.*, suggesting that the District was aware of prior incidents in which MPD officers

failed to make necessary and timely disclosures to the prosecution – the Fifth Amendment claim

against the District is equally futile.

    D.  <u>Count IV: False Arrest, Malicious Prosecution, Assault and Battery, and Conspiracy</u>

In Count IV, Kenley asserts a number of common-law tort claims.  Specifically, he

alleges that various Defendants are liable for conspiracy, false arrest, false imprisonment,

malicious prosecution, and assault and battery.  The Court notes at the outset that the manner in

which Plaintiff has lumped these claims together in one purported count is distinctly unhelpful.

If these are intended as discrete causes of action, they should have been broken down into

separate counts.  Although the Court will consider them as independent claims for purposes of

this Motion, Plaintiff must set them forth separately in his next pleading if he wishes to proceed

on each of them.

    1.  *Conspiracy*

Kenley accuses all four officers of engaging in a conspiracy and asserts that their

conspiratorial actions are imputed to the District under the doctrine of *respondeat superior*.

"The elements of civil conspiracy are: '(1) an agreement between two or more persons; (2) to

participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused

by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in

furtherance of, the common scheme.'" <u>Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.</u>, 749

A.2d 724, 738 (D.C. 2000) (quoting <u>Griva v. Davison</u>, 637 A.2d 830, 848 (D.C. 1994)).  As

Defendants point out, D.C. law does not provide an independent cause of action for conspiracy;

instead, "it is a means for establishing vicarious liability for [an] underlying tort."  Id. (internal

quotation marks and citations omitted).  To the extent, therefore, that Plaintiff seeks to hold

Defendants liable for "conspiracy" independent of any other tort, see Am. Compl., ¶ 60 ("These

individual officers committed the common law tort of conspiracy . . . ."), Defendants are correct

that such a claim cannot stand.

On the other hand, to the extent Plaintiff asserts the existence of a conspiracy to hold the

officers liable for the acts of others involved in the conspiracy, he may do so.  In that regard, and

as discussed previously, Kenley has adequately pled the existence of a conspiracy.  With respect

to the intracorporate-conspiracy doctrine, also discussed *supra*, it appears that the D.C. Court of

Appeals has not decided its applicability under District law.  See Exec. Sandwich Shoppe, 749

A.2d at 739 (directing trial court to consider, on remand, "the applicability of the intracorporate

conspiracy doctrine" to civil-conspiracy claim); see also Rawlings, 820 F. Supp. 2d at 104 ("The

District of Columbia Court of Appeals does not appear to have addressed whether or to what

extent it recognizes the [intracorporate-conspiracy] doctrine in regard to alleged violations of

D.C. statutory or common law") (citing Exec. Sandwich Shoppe, 749 A.2d at 739).

While the Court's research has uncovered district court decisions in this jurisdiction

applying the doctrine to preclude claims of conspiracies to commit common-law torts where

defendants acted within the scope of their employment, see Plummer v. Safeway, Inc., 934 F.

Supp. 2d 191, 198 (D.D.C. 2013); In re Nation's Capital Child and Family Development, Inc.,

457 B.R. 142, 163 (Bank. D.C. 2011), those cases purported to be following the D.C. Court of

Appeals' decision in Executive Sandwich Shoppe.  That case, however, did not decide the issue.

Nor did it provide any indication of the doctrine's possible scope under D.C. law.  As noted

before, moreover, it is not clear that the doctrine should apply where the conduct complained of

can hardly be described as the routine acts of a police department and where police officers

allegedly engaged in serious misconduct to achieve their own personal ends.  The Court will thus

not rely on it here, but Defendants may raise the issue again on summary judgment with more

complete briefing.

### 2.  *False Arrest & False Imprisonment*

This claim is brought against each of the officers and the District.  Shaatal does not

dispute that Kenley has adequately pled a claim for false arrest or imprisonment against him, and

the District concedes that it may be liable under a theory of *respondeat superior*.  See District

Mot. to Dismiss at 1.  This leaves Dorrough, Littlejohn, and Baldwin.

As a preliminary matter, all Defendants argue that Plaintiff's common-law claims for

false arrest and false imprisonment are duplicative and that both should not proceed.  Although

dismissing one will have little to no practical effect, the Court agrees that the two "rise and fall

together" in this case.  Minch v. District of Columbia, 952 A.2d 929, 938 n.8 (D.C. 2008); see

also id. (explaining the narrow distinction between false-imprisonment and false-arrest claims);

Enders v. District of Columbia, 4 A.3d 457, 461 (D.C. 2010) ("'False arrest' is indistinguishable

as a practical matter from the common law tort of 'false imprisonment.'") (citing Dent v. May

Dep't Stores Co., 459 A.2d 1042, 1044 n.2 (D.C. 1982)); Hernandez v. District of Columbia, 845

F. Supp. 2d 112, 119 n.7 (D.D.C. 2012) ("Although plaintiff alleges in his complaint that WCSA

is liable for false arrest and imprisonment, the Court treats that claim as one simply for false

arrest, since there is no real difference as a practical matter between false arrest and false

imprisonment.") (internal quotation marks, citations, and alterations omitted).  The Court will,

therefore, treat Plaintiff's claim against Defendants as one for false arrest.

Moving on, Dorrough and Littlejohn question the false-arrest claim against them, which is based on a conspiracy theory, on the grounds that Kenley has not alleged sufficient facts to show the existence of a conspiracy; the intracorporate-conspiracy doctrine protects them; and there is no valid underlying tort to substantiate the conspiracy claim.  The Court has already addressed the first two and is perplexed by the last.  The underlying tort alleged is Kenley's false arrest.  As Shaatal acknowledges, Plaintiff has made out such a claim – to wit, he has asserted that he was arrested based on fabricated information.

Baldwin's separate arguments are similarly unavailing.  He argues that: (1) the Amended Complaint does not allege that he arrested Kenley; (2) Kenley has failed to show that he was not reasonably relying on Shaatal's order to "get him back," and (3) the Amended Complaint fails to include sufficient factual allegations that Baldwin was aware that there was no evidence of Kenley's acting illegally.  <u>See</u> Baldwin's Opp. at 6-7.  It is enough to say here that the Amended Complaint sufficiently alleges that Baldwin conspired with the other officers to arrest Kenley while knowing that probable cause was lacking.

### 3.  *Assault and Battery*

In his Amended Complaint, Plaintiff abandoned his common-law assault-and-battery (or excessive-force) claim against Shaatal, Dorrough, and Littlejohn.  This leaves Officer Baldwin, as well as the District under a theory of *respondeat superior*.  Both concede that Kenley has adequately stated this cause of action against them.

### 4.  *Malicious Prosecution*

This claim is brought against each of the officers and the District.  "To support a malicious prosecution claim [under D.C. law], 'there must be (a) a criminal proceeding <u>instituted</u> or <u>continued</u> by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) Malice, or a primary

purpose in instituting the proceeding other than that of bringing an offender to justice.'" <u>Amobi v. District of Columbia Dep't of Corrections</u>, 755 F.3d 980, 991 (D.C. Cir. 2014) (quoting <u>DeWitt v. District of Columbia</u>, 43 A.3d 291, 296 (D.C. 2012)) (alterations omitted).  Here, Defendants only contest whether Kenley has adequately pled the second element – *i.e.*, that his criminal case was terminated in his favor.

Under D.C. law, a favorable termination does not require a showing that the plaintiff was found innocent after a trial.  <u>See</u> <u>Brown v. Carr</u>, 503 A.2d 1241, 1245 (D.C. 1986).  The termination must, however, "reflect on the merits of the underlying action."  <u>Id.</u> (quoting <u>Lackner v. LaCroix</u>, 25 Cal.3d 747, 750 (1979)) (internal quotation marks omitted).  In the present case, Kenley was not acquitted at trial; rather, the prosecutor moved to dismiss the criminal charges after a few months.  Dismissal standing alone tells us little.  As another district court explained:

> Prosecutors may dismiss or *nolle prosequi* cases for a whole host of reasons.  Lack of adequate resources, a higher priority for other cases in an overburdened criminal justice system, witness availability problems, the heavy trial schedule of the particular prosecutor, and numerous other reasons all come to mind.  None of these reasons necessarily reflect on the innocence of the accused.  Moreover, prosecutors will ordinarily have a whole mix of reasons, which may well include the strength of the evidence in the case.  <u>But where prosecutors have not stated their reasons, there is really no way for th[e] Court to conclude that these were favorable terminations.</u>

<u>O'Quinn v. District of Columbia</u>, No. 87-74, 1988 WL 23244, at *2 (D.D.C. Mar. 4, 1988) (emphasis added).  Merely alleging that criminal charges were dismissed is, accordingly, insufficient to plead that the underlying case was favorably terminated.  Here, Kenley does not allege that the prosecutor gave any reasons – *e.g.*, a lack of evidence – during the Superior Court proceedings for abandoning the charges.

Another shortcoming is Kenley's failure to allege that the charges were dismissed <u>with</u> prejudice.  In <u>Harris v. District of Columbia</u>, 696 F. Supp. 2d 123 (D.D.C. 2010), the court dismissed a malicious-prosecution claim under similar circumstances.  <u>See id.</u> at 133-34.  The court emphasized that the docket sheet from the Superior Court proceedings "d[id] not state any reason for termination of the prosecution."  <u>Id.</u> at 134.  It also did not indicate that the charges were dismissed with prejudice, and "under District of Columbia law, '[a] dismissal shall be without prejudice unless otherwise stated.'"  <u>Id.</u> (citing D.C. R. Crim. P. 48(a)).  The court thus concluded that "[t]o satisfy this essential element of malicious prosecution, [a plaintiff] bears the burden of alleging that his charges were dismissed with prejudice."  <u>Id.</u>  Because the plaintiff had not done so, the court dismissed the claim.

Here, Defendants submitted the docket sheet from Kenley's Superior Court proceedings, <u>see</u> District Mot. to Dismiss, Exh. 1 (Criminal Docket Sheet), which the Court may take judicial notice of on a motion to dismiss.  <u>See</u> <u>Covad Communications Co. v. Bell Atlantic Corp.</u>, 407 F.3d 1220, 1222 (D.C. Cir. 2005).  Like the one in <u>Harris</u>, it does not indicate the reason that the charges were dismissed or that they were dismissed with prejudice.  Kenley, moreover, does not allege in his Amended Complaint that the latter is true.  This failure sinks his malicious-prosecution claim.  <u>See id.</u> at 123; <u>see also</u> <u>Magliore v. Brooks</u>, 844 F. Supp. 2d 38, 46 (D.D.C. 2012) (noting that to show favorable termination, plaintiff "was required to prove that his charges were dismissed with prejudice"); <u>Ronkin v. Vihn</u>, No. 12-729, 2014 WL 5280682, at *9 n.14 (D.D.C. Oct. 16, 2014) (noting that plaintiff would be unable to satisfy a favorable termination requirement because "[t]he docket report for the plaintiff's underlying charges indicate[d] only that the charges were dismissed *nolle prosequi* . . . without any indication that the dismissal was with prejudice," and because plaintiff "ha[d] not provided the Court with

supporting documents from the trial Court to further explain the [favorable nature of the] dismissal as he represented he would attempt to do") (some alterations in original; internal quotation marks and citation omitted).  A dismissal of the common-law claim for malicious prosecution, the Court notes, does not resolve whether Kenley has stated a Fourth Amendment malicious-prosecution claim under Section 1983, which proceeds under a different standard and need not be resolved now.

### E.  Count V: Negligence

In Count V, Kenley rather broadly asserts that all of the officers "failed to exercise reasonable care as police officers in the performance of their duties in arrest, use of force, gathering and the disclosure of exculpatory evidence and protecting Mr. Kenley's right to videotape police activity, resulting in his injuries."  Am. Compl., ¶ 68.  He also asserts several bases for holding the District liable for negligence, including its failure to train and supervise its officers about the rights of citizens to videotape police officers, its failure to supervise officers with histories of misconduct, and the doctrine of *respondeat superior*.  See id., ¶¶ 66-68.  The Court takes up the claims against the officers first and then turns to those against the District.

#### 1.  *Individual Officers*

##### a.  Dorrough and Littlejohn

Although Count V states generally that all of the officers failed to exercise reasonable care in performing a variety of duties, see id., ¶ 68, the negligence claims against Dorrough and Littlejohn appear to rest on their alleged failure to promptly disclose exculpatory evidence to the prosecution.  See Reply to Officers' Opp. at 20-21 (failing to respond to Dorrough and Littlejohn's assertions to this effect).  In their defense, they press two arguments – *viz.*, that Plaintiff has failed to allege the standard of care that they violated and that they are absolutely

immune for their actions in conducting a criminal investigation.  See Dorrough's Opp., ECF No. 32, at 10.

The first argument may be readily rejected.  While Defendants focus on whether violations of an MPD General Order can constitute negligence *per se*, see id. at 11; Reply to Officers' Opp. at 21, that is beside the point.  Plaintiff is not asserting that the General Order is a statute or regulation that establishes negligence *per se*.  As to both officers, Plaintiff alleged that they failed to exercise the standard of care of a reasonably prudent police officer.  See Am. Compl., ¶ 68.  At this stage of the litigation, this is sufficient.

The second argument is more difficult to resolve.  Under District of Columbia law, an official may have absolute immunity from suit where "(1) the official acted within the outer perimeter of his official duties, and (2) the particular government function at issue was discretionary as opposed to ministerial."  Minch, 952 A.2d at 939 (quoting Moss v. Stockard, 580 A.2d 1011, 1020 (D.C. 1990)) (internal quotation marks and alterations omitted).  Conveying evidence to a prosecutor easily falls within an officer's core duties.  The thornier question is whether this function is discretionary or ministerial.

The inquiry into discretionary versus ministerial functions "seeks to ascertain whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to assure fearless, vigorous, and effective decisionmaking."  Moss, 580 A.2d at 1020 (quoting District of Columbia v. Thompson, 570 A.2d 277, 297 (D.C. 1990)) (internal quotation marks omitted).  In essence, courts are required to decide "whether society's concern to shield the particular government function at issue from the disruptive effects of civil litigation requires subordinating the vindication of private injuries otherwise compensable at law."  Moss, 580 A.2d at 1020-21.  In balancing these competing interests, courts are to consider the

following, non-exhaustive list of factors: "(1) the nature of the injury, (2) the availability of alternative remedies, (3) the ability of the courts to judge fault without unduly invading the executive's function, and (4) the importance of protecting particular kinds of acts." Minch, 952 A.2d at 939 (citation omitted).  The D.C. Court of Appeals has "cautioned that the scope of immunity should be no broader than necessary to ensure effective governance." Id. (quoting Moss, 580 A.2d at 1021) (internal quotations marks and citation omitted).

The Court is doubtful that decisions about whether to share exculpatory evidence with the prosecution are the sort of discretionary activities to which absolute immunity should attach. Such acts seem markedly different from those that have been given absolute protection because of the hard choices that they entail.  See, e.g., Nealon v. District of Columbia, 669 A.2d 685, 689-91 (D.C. 1995) (finding that District's decision to reduce water pressure in fire hydrants was discretionary function because it "reflect[ed] policy decisions of government officials," including "the District's allocation of financial or natural resources").  Indeed, it is hard to fathom why police officers would require total immunity to fearlessly discharge their responsibilities to disclose (or not disclose) exculpatory material to the prosecution.  One would think that these decisions do not require difficult policy trade-offs, and that police should err on the side of disclosure.  Cf. Moldowan, 578 F.3d at 380 n.8 (contrasting the "discretionary legal judgment prosecutors make when disclosing evidence directly to criminal defendants" with the act of police officers' disclosing evidence to the prosecutor, which "does not require technical legal expertise because the act is essentially ministerial, not discretionary") (internal quotation marks and citation omitted).

In any event, "'the burden of establishing that the official function in question merits absolute immunity rests on the defendant official.'" Minch, 952 A.2d at 936-37 (quoting Moss,

580 A.2d at 1020-21 n.18).  Defendants barely make an effort to demonstrate a need to insulate this function from suit.  The entirety of Sergeant Dorrough's argument is: "'Discretionary acts have been defined as acts that require personal deliberation, decision and judgment.'  Sergeant Dorrough thus had discretion in determining how to conduct his investigation."  Dorrough's Opp. at 11-12 (quoting Nealon, 669 A.2d at 690).  Littlejohn makes a similarly conclusory statement that since "the conduct of a criminal investigation is a discretionary function," he is entitled to absolute immunity.  See Littlejohn's Opp., ECF No. 30, at 10.  They do not provide the Court with citations to cases providing similar protections.  They also do not even bother to mention the four factors that courts are to consider in distinguishing ministerial from discretionary functions, let alone provide any discussion about how those factors should favor a grant of absolute immunity here.  While the Court is mindful that "[w]henever possible, the question of absolute immunity should be determined at the outset of litigation," District of Columbia v. Jones, 919 A.2d 604, 610 (D.C. 2007), it is difficult to do so when those asserting it do little to explain the need for it.  The Court will, therefore, abstain from ruling definitively on this issue at this time.  It will, however, allow Defendants to raise this issue again, if they wish, but it expects them to make some showing that this function should be absolutely protected.

b.   Baldwin

Kenley's negligence claim against Baldwin appears limited to the negligent use of force. See Reply to Officers' Opp. at 19-21 (failing to contest Baldwin's assertion that negligence claim against him is so limited).  Baldwin argues that this cause of action must be dismissed because Kenley has only stated a claim for assault and battery, not negligence.  He is correct.

Baldwin relies on District of Columbia v. Chinn, 839 A.2d 701 (D.C. 2003), in which the D.C. Court of Appeals discussed the need to distinguish between these claims.  The court

acknowledged that "[a]n individual who has been injured by a District police officer may sue

under one or more common law theories of legal liability such as assault and battery or

negligence," but that "in a case involving the intentional use of force by police officers, [if] a

negligence count is to be submitted to a jury, that negligence must be distinctly pled and based

upon at least one factual scenario that presents an aspect of negligence apart from the use of

excessive force itself and violative of a distinct standard of care." Id. at 711.  This is because

"[i]ntent and negligence are regarded as mutually exclusive grounds for liability.  As the saying

goes, there is no such thing as a negligent battery." Id. at 706 (internal quotation marks and

citation omitted).  In Chinn, the Court of Appeals concluded:

> The allegations [in the plaintiff's complaint] d[id] not reflect
> negligence, but rather an intentional tort with a conclusory
> allegation of negligence.
> . . .
> The crux of [the plaintiff's] claim [wa]s that the officers
> deliberately inflicted excessive force upon him, and the evidence
> he presented at trial was that officers continuously assaulted him
> without provocation.  [He] did not argue that the officers
> mistakenly or negligently thought [he] was armed; [he] did not
> allege that the officers misperceived him as a threat.

Id. at 711.  It ruled, accordingly, that the complaint did not assert a cause of action for

negligence.

Relying on Chinn, district courts in this jurisdiction have dismissed negligence claims

where the plaintiffs' complaints did not support a negligence theory separate and apart from their

intentional assault-and-battery claims. See, e.g., Rice v. District of Columbia, 715 F. Supp. 2d

127, 131-32 (D.D.C. 2010) (dismissing negligence count against officer because it failed to state

claim "separate and apart from the battery alleged" in other counts); Hall v. Lanier, 708 F. Supp.

2d 28, 32 (D.D.C. 2010) (dismissing negligence claim because "the allegations of the complaint .

. . do not reflect negligence, but rather an intentional tort with a conclusory allegation of

negligence") (internal quotation marks and citation omitted); <u>Spicer v. District of Columbia</u>, 916 F. Supp. 2d 1, 5 (D.D.C. 2013) (granting judgment on the pleadings for defendants because "there simply [we]re no factual allegations separate from those comprising the intentional tort claims to support a distinct negligence claim"); <u>Kivanc</u>, 407 F. Supp. 2d at 277 (granting judgment for defendants on negligence claims because "plaintiff simply alleges that he was attacked, beaten, and jailed by defendants without provocation," which "is not negligence, but the intentional tort of assault and battery," and because "[i]nvoking the words 'duty,' 'breach,' 'cause,' and 'injury' does not transform an intentional tort into negligence"); <u>Tafler</u>, 2006 WL 3254491, at *9 (finding that plaintiff "failed to allege negligence claims that are separate and distinct from his intentional tort claims," because "plaintiff simply alleges that he was attacked, beaten, and detained by defendants without provocation").

The D.C. Circuit also recently upheld the grant of summary judgment to a defendant on a negligent-infliction-of-emotional-distress claim because the plaintiff's complaint did not properly plead such a cause of action.  <u>See</u> <u>Harris v. Dep't of Veterans Affairs</u>, 776 F.3d 907, 916 (D.C. Cir. 2015).  Citing <u>Chinn</u>, the court explained that the plaintiff had failed to distinguish his negligent-infliction-of-emotional-distress claim from his intentional one.  He had described the defendant's acts "as knowing and 'intentional'" and had failed to "identify any specific act that was allegedly negligent."  <u>Id.</u> (internal quotation marks and citation omitted). Because "'[i]ntent and negligence are regarded as mutually exclusive grounds for liability,'" <u>id.</u> (quoting <u>Chinn</u>, 839 A.2d at 706), the negligence cause of action had been nothing more than an attempt to shoehorn an intentional tort into a negligent one.

Kenley's Amended Complaint likewise does not support a theory of negligence.  It asserts only that Baldwin "charged" at him and "intentionally knock[ed] his cellphone . . . out of

his hands and pushed him violently to the ground," without any justification.  <u>See</u> Am. Compl., ¶ 12.  The Court thus denies Plaintiff's Motion to Amend the negligence claim with respect to Baldwin.

> c.   Shaatal

Plaintiff's negligence claim against Shaatal offers yet another variant.  In his Opposition, Shaatal argues that Kenley seeks to hold him responsible for negligence "by dressing up his claim for false arrest . . . as [one for] negligence."  <u>See</u> Shaatal's Opp., ECF No. 36, at 12-13 (citing <u>Chinn</u>, 839 A.2d at 701, 708).  Kenley does not abjure this position in his Reply.  He did, however, respond to Shaatal's contention in his earlier Opposition to Shaatal's Motion to Dismiss.  There, he argued that he had stated a negligence claim, pointing to his allegations that the officers "knew or should have known that their actions violated defendant's First and Fourth Amendment rights"; that "no sworn police officer reasonably could have believed that Mr. Kenley was violating the law by videotaping the arrest of Richard Jones from a safe distance and commenting that he was not resisting arrest"; and that "no sworn police officer reasonably could have believed that there was legal justification to physically restrain or strike Mr. Kenley in order to stop him taking video with his cell phone . . . ."  Pl.'s Opp. to Shaatal's Mot. to Dismiss, ECF No. 23, at 10-11.

These allegations, however, do not plead a distinct theory of negligence; rather, they go to whether the officers had probable cause and whether they were immune.  The negligence claim is therefore deficient.  <u>See</u> <u>Chinn</u>, 839 A.2d at 711; <u>see also</u> <u>Stewart-Veal v. District of Columbia</u>, 896 A.2d 232, 235 (D.C. 2006) (upholding district court's dismissal of negligence count because "it [wa]s not separate and distinct from the false arrest claim") (citing <u>Chinn</u>, 839 A.2d at 711, and <u>Sabir v. District of Columbia</u>, 755 A.2d 449, 452 (D.C. 2000)).

2.   *District*

The District concedes that it may be <u>vicariously</u> liable for the negligent acts of its officers under the theory of *respondeat superior*.  As just discussed, the only negligent acts of the officers that have survived are Dorrough and Littlejohn's failures to disclose evidence.  In addition, Plaintiff has alleged the city is <u>directly</u> liable for negligent training and supervision of its officers.  The District, however, argues that Kenley should not be permitted to proceed with these direct-liability claims because they are unnecessary and prejudicial.  <u>See</u> District's Opp. at 14.

There appears to be some disagreement regarding whether plaintiffs should be able to advance negligence claims against employers under the alternative theories of *respondeat superior* <u>and</u> negligent hiring, supervision, or training where the employers have <u>conceded</u> their potential liability under the former.  For instance, in <u>Flythe v. District of Columbia</u>, 19 F. Supp. 3d 311 (D.D.C. 2014), the district court rejected the city's position that a negligent-supervision claim should be dismissed as duplicative of the *respondeat superior* claims, explaining that "[c]ase law is clear that respondeat superior liability is distinct from negligent supervision liability."  <u>Id.</u> at 317 n.5; <u>see also</u> <u>Amons v. District of Columbia</u>, 231 F. Supp. 2d 109, 116 (D.D.C. 2002) (denying District's motion to dismiss negligent-supervision claim as duplicative and prejudicial).

Other courts, however, have dismissed the direct-liability claims in such instances, noting that they are unnecessary and prejudicial.  In <u>Hackett v. Washington Metropolitan Area Transit Authority</u>, 736 F. Supp. 8 (D.D.C. 1990), for example, a district court considered whether the plaintiff could advance alternative theories of negligence against WMATA – namely, vicarious liability under the doctrine of *respondeat superior* and direct liability for negligent entrustment.

<u>See</u> <u>id.</u> at 9.  It ruled that the plaintiff could not, explaining that the claim was unnecessary since it did not give rise to additional liability (*e.g.*, punitive damages) and that it would be prejudicial. <u>See</u> <u>id.</u> at 10-11.  The potential prejudice stemmed from the fact that the negligent-entrustment claim would enable the plaintiff to introduce the employee's past driving record – something that would not have been otherwise admissible against the employee.  <u>See</u> <u>id.</u> at 9.  Other courts have followed suit and denied plaintiffs the opportunity to advance these alternative theories where the employer has conceded that it would be vicariously liable if its employee were found negligent.  <u>See</u> <u>Harvey v. Mohammed</u>, 841 F. Supp. 2d 164, 181 (D.D.C. 2012) (granting summary judgment on negligent-hiring and -retention claim because it "would not impose any additional liability on the defendants," and because it was "prejudicial and unnecessary").

Notably, in <u>Burkhart v. Washington Metropolitan Area Transit Authority</u>, 112 F.3d 1207 (D.C. Cir. 1997), the D.C. Circuit considered an appeal from a district court's denial of a motion to dismiss a negligent-training claim on this basis.  The district court had denied the motion because it was untimely, but it had also ruled, alternatively, that it would have rejected the motion on the merits as well.  The Circuit upheld the decision because it agreed that the motion was untimely.  <u>Id.</u> at 1215-16.  But it noted that it had "serious reservations concerning the trial court's alternative denial of the motion on the merits," citing to the decision in <u>Hackett</u>.  <u>Id.</u> at 1216.  This suggests that courts should carefully consider whether it is appropriate to submit negligent-training and -supervision claims to a jury where employers have admitted their potential liability under *respondeat superior*.

It is clear, however, that the primary concern driving the decision in <u>Hackett</u> was the likely introduction of the employee's past driving record and the prejudicial effect that would have on the defendants.  <u>See</u> <u>Hackett</u>, 736 F. Supp. at 10-11; <u>see also</u> <u>Amons</u>, 231 F. Supp. 2d at

38

116 ("[T]he 'gravamen' of the issue in <u>Hackett</u> was the admissibility of the defendant employee's driving record . . . ."). The cases that have dismissed the direct-liability claims against employers appear to have largely resolved those issues at summary judgment or shortly before trial – that is, after the parties had the opportunity to develop their claims. Those courts, consequently, had the benefit of assessing the evidence that the parties would offer in support of their claims when deciding whether allowing direct-liability claims to go forward would be unduly prejudicial.

At this stage of the litigation, the Court does not know how the negligence claims against the District and the individuals will develop and what evidence Kenley will seek to offer in support of them. It thus believes that it would be improper, at this time, to determine whether allowing such claims to stand could prejudice Defendants. <u>See id.</u> at 116 ("[P]laintiff's claim for negligent supervision will not be dismissed at this stage of the proceedings, in the absence of a showing that the District will somehow be prejudiced if plaintiff is permitted to pursue this claim."). If this case does go to trial, this issue can be reevaluated then.

    F.   <u>Count VI: Defamation</u>

This cause of action was initially brought against each of the individual officers and the District of Columbia. Kenley has, however, abandoned it as to Defendants Littlejohn, Dorrough, and Baldwin. It is therefore asserted against only Shaatal and the District (under a theory of *respondeat superior*).

"Defamation under D.C. law requires a plaintiff to show a defamatory statement, publication to a third party, negligence, and either that the statement is actionable as a matter of law or that publication caused the plaintiff special harm." <u>Westfahl v. District of Columbia</u>, 2014 WL 6999078, at *5 (D.D.C. Dec. 12, 2014) (citing <u>Oparaugo v. Watts</u>, 884 A.2d 63, 76

(D.C. 2005)).  "A defamatory statement is one 'that tends to injure the plaintiff in his [or her]

trade, profession or community standing, or lower him [or her] in the estimation of the

community."  Kendrick v. Fox Television, 659 A.2d 814, 819 (D.C. 1995) (quoting Moss v.

Stockard, 580 A.2d 1011, 1023 (D.C. 1993)) (alterations in original).  "Publication requires

making a statement to at least one other person," and "[a] false allegation of criminal

wrongdoing is defamation *per se*."  Westfahl, 2014 WL 6999078, at *5 (citing Charlton v. Mond,

987 A.2d 436, 438 n.4 (D.C. 2010), and Von Kahl v. Bureau of Nat'l Affairs, Inc., 934 F. Supp.

2d 204, 218-19 (D.D.C. 2013)).  In his Reply, Plaintiff suggests that there are three bases for

holding Shaatal liable for defamation: "the publication of false statements to Officer Baldwin,

animal control staff, and upon information and belief, to Mr. Kenley's employer."  Reply to

Officer's Opp. at 22.  None of these makes it past the starting gate.

     With regard to the first – Shaatal's statement to Baldwin that Kenley had sicced his dog

on him – Kenley has not stated an actionable claim for defamation against Shaatal.  While

Shaatal may have made a false statement to a third party – *i.e.*, Baldwin – the third party knew

that it was false at the time it was made.  The statement thus could not have harmed Plaintiff in

Baldwin's eyes.  Since Kenley does not allege that anyone else, such as his neighbors, overheard

Shaatal's statement to Baldwin, he has failed to allege any injury to his reputation.

     Moving on, the proposed Amended Complaint does not allege that Shaatal (or any other

officer) ever contacted animal control.  The only mention of animal control is in paragraph 14,

which states that Shaatal "threatened to have Mr. Kenley's dog killed," and that he told Plaintiff

"animal control is coming for your dog."  Am. Compl., ¶ 14.  Shaatal thus does not appear to

have communicated any defamatory statements to animal-control staff.

Finally, regarding the statements made to Kenley's employer, the Amended Complaint asserts only that "[a]n unknown MPD officer . . . contacted Mr. Kenley's employer and informed it that he had been arrested for assaulting a police officer, and as a result of the arrest, Mr. Kenley was suspended without pay during the pendency of the criminal case." Id., ¶ 15.  As Plaintiff does not suggest that Shaatal was the one who contacted his employer, that officer cannot be liable.  This Count, consequently, may not proceed.

## IV.     Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion to Amend his Complaint in part and deny it in part.  A contemporaneous Order will explain what counts against which Defendants an Amended Complaint may contain.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 13, 2015